<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MR. JEFFREY C. BAKER,    :
            :   Civil Action No. 11-1705 (KM)
     Petitioner,  :
            :
     v.      :   **OPINION**
            :
MR. GREG BARTKOWSKI, et al., :
            :
     Respondents.  :

**APPEARANCES:**

   JEFFREY C. BAKER, Petitioner *pro se*
   # 442546/880972-B
   New Jersey State Prison
   P.O. Box 861
   Trenton, New Jersey 08625

   SARA BETH LIEBMAN, ESQ.
   UNION COUNTY PROSECUTOR'S OFFICE
   32 Rahway Avenue
   Elizabeth, New Jersey 07202
   Counsel for Respondents

**MCNULTY**, District Judge

   Petitioner Jeffrey C. Baker, a convicted state prisoner presently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New Jersey state court judgment of conviction entered on or about January 23, 2003. For the reasons stated below, the Petition is denied for lack of substantive merit.

## I.   BACKGROUND

### A.   Procedural History

On June 2001, a Union County grand jury returned Indictment No. 01-06-0758 against Mr. Baker, charging him as follows: (Count One) first degree robbery, in violation of N.J.S.A. 2C:15-1; (Count Two) second degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a); (Count Three) third degree unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b); and (Count Four) fourth degree aggravated assault, in violation of N.J.S.A. 2C:12-1(b)(4).  The grand jury also returned Indictment No. 01-06-0759, charging Mr. Baker with a single count of second degree possession of a weapon by a prohibited person, in violation of N.J.S.A. 2C:39-7.  (Ra8,[1] Pet. Brief on PCR Appeal at 1.)

A pretrial hearing was conducted on October 22, 2002, before the Honorable Walter R. Barisonek, J.S.C., to determine the admissibility of other bad acts evidence pursuant to N.J.R.E. 404(b).  (Ra15.)  Thereafter, Judge Barisonek presided over a jury trial on October 24, 28, 29, and 30, 2002.  (Ra16 through Ra20.)  The jury returned a verdict of guilty on all

---

[1] "Ra" denotes the appendix or record of the state court proceedings as submitted by the State with its answer to the habeas petition.  (See ECF Nos. 12, 12-1 through 12-32.)  A description or identification of the exhibits comprising the appendix is set forth in a letter from the State docketed at ECF No. 12-1.

counts on October 30, 2002.  (Ra20.)  Thereafter, Mr. Baker filed a motion for a new trial on the ground that the evidence at trial was inadequate to sustain the jury's verdict.  Judge Barisonek denied Petitioner's motion on January 10, 2003. (Ra22.)

On January 24, 2003, Judge Barisonek sentenced Mr. Baker to an extended term of 35 years in prison with a 17-year parole disqualifier, on Count One of Indictment No. 01-06-0758 (first degree robbery).  The remaining Counts Two, Three and Four were merged into Count One for purposes of sentencing.  As to Mr. Baker's conviction on Indictment No. 01-06-0759 (second degree possession of a weapon by a prohibited person), Judge Barisonek sentenced him to a consecutive term of 9 years in prison with 4 years of parole ineligibility.  Consequently, Mr. Baker was sentenced to an aggregate prison term of 44 years with 21 years of parole ineligibility, subject to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.  (Ra23.)

Mr. Baker filed a direct appeal from his conviction and sentence on March 21, 2003, before the Superior Court of New Jersey, Appellate Division.  (Ra1 at Da23.)  In a *per curiam* opinion decided on July 8, 2005, the Appellate Division affirmed the convictions and the extended sentence, but remanded the matter for resentencing on the conviction for possession of a

3

weapon by a prohibited person.  (Ra3.)  On July 29, 2005, Mr. Baker was resentenced on that conviction to the same consecutive 9 year prison term with 4 years of parole ineligibility.  (Ra8 at 3, Da57.)

On August 3, 2006, the Supreme Court of New Jersey granted certification on the issue of sentencing and remanded the matter for resentencing pursuant to *State v. Pierce*, 188 N.J. 155 (2006).  (Ra8 at 3, Da57.)  On October 6, 2006, Mr. Baker was resentenced to the same sentence initially imposed on January 24, 2003.  (Ra8 at 3, Da40, Da57.)

Some four years later, on July 23, 2007, Mr. Baker filed a petition for post-conviction relief ("PCR") in state court.  (Ra8 at 3, Da22-Da36.)  Judge Barisonek conducted PCR hearings on April 14, April 16, May 12, June 2, and June 4, 2008.  (Ra8 at 3; Ra24 through Ra27.)  On June 4, 2008, Judge Barisonek issued an oral opinion denying the PCR petition, and a separate Order was filed that same date.  (Ra27, Ra7.)

Mr. Baker then appealed from denial of his PCR petition.  (Ra8.)  On December 8, 2010, the Appellate Division affirmed the decision denying the PCR petition.  (Ra11.)  The New Jersey Supreme Court denied certification on June 30, 2011.  (Ra14.)

On March 18, 2011, Mr. Baker filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)

4

The State filed an answer, together with the relevant state
court record, on April 20, 2012.  (ECF Nos. 12, 12-1 through 12-
32.)  Mr. Baker filed his traverse or reply on August 8, 2012.
(ECF No. 15.)

B.   Factual Background

     This Court, affording the state court's factual
determinations the appropriate deference, see 28 U.S.C. §
2254(e)(1), will simply reproduce the recitation of facts as set
forth in the unpublished opinion of the Superior Court of New
Jersey, Appellate Division, decided on July 8, 2005, with
respect to Petitioner's direct appeal:

> At approximately 4:30 a.m. on April 11, 2003, Tammy Cross
> was seated at the dining room table at her aunt's house in
> Plainfield.  A number of other people were there, playing
> cards, talking and doing crossword puzzles.  At about that
> time, defendant and Brent Lark came into the house and
> began to engage in conversation with some of the others who
> were present.  Cross knew Lark but did not know defendant.
> She described defendant and said that he was wearing a
> black hooded sweatshirt and a headband.  While defendant
> was present, Richard Moore, who was Cross's boyfriend, gave
> her $250, which she folded and placed in her pocket.
>
> After a time, defendant, Lark and another man went outside,
> then came back into the house and went together into the
> bathroom.  The three of them then came out of the bathroom
> and Cross heard the front door close.  According to her
> testimony at trial, Cross realized that Lark had left but
> that defendant had remained in the house.  She saw
> defendant standing in the doorway of the dining room and
> saw that he had put on black gloves.  She saw that he had a
> gun in his hand, which he was holding down at his side.
> Defendant then asked: "Tammy, do you know what time it is?"

5

When she asked him what he meant, he pointed the gun at her and motioned for her to be quiet.

Cross then asked if defendant was planning to shoot her after he had just been socializing with her and he told her that he would. Defendant then took Cross's cell phone and asked her for the money. When she refused, he demanded that she give him the money from her pocket. Cross stood up and stepped back, hoping to run away, but realized that it would be difficult to escape. She then took the money from her pocket and put it on the table. Defendant picked it up, put it into his pocket and backed out of the house, still pointing the gun at Cross.

After defendant left, Cross ran outside and telephoned the police. She later identified defendant and Lark from photo arrays. Valerie Minney, one of the residents of the house who was there that evening, corroborated Cross's testimony and identified defendant as the robber.

(Ra3, July 8, 2005 App. Div. Op. at 3-5.)

## II.   STATEMENT OF CLAIMS

Mr. Baker asserts the following claims in his petition for habeas relief:

**Claim One**:  The trial court's admission of the highly prejudicial testimony of Brian McCloud regarding a prior criminal incident deprived Mr. Baker of a fair trial.

**Claims Two through Five**:  Ineffective assistance of trial counsel in failing to conduct adequate pretrial investigation via ancillary investigative services and in failing to interview and produce Shoranda "Shorty" Williams or other witnesses at trial to support a "theft-no-robbery" defense. Mr. Baker further claims that trial counsel was ineffective in relying

6

solely on the testimony of a witness, Vernon Lewis, who indicated that Petitioner was not present at the robbery, and in presenting an identification and alibi defense while neglecting to pursue investigation of three other witnesses, Brent Lark, Rajon Lewis and Sharonda Williams, who would support the "theft-no-robbery" defense.

**Claim Six**: The PCR court abused its discretion by "summarily reject[ing] the testimony" of witnesses Mr. Lark, Mr. Lewis, and Ms. Williams "without fairly testing its credibility by placing it in front of a jury" and "usurp[ing] the fact finding responsibilities of a jury."

(ECF No. 1, Petition at 4-13, ¶¶ 12A-12F.)

The State essentially contends that the petition is without merit and should be denied.  (ECF No. 12, Answer at 4-13.)

## III.   STANDARD OF REVIEW

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2254 provides, in pertinent part:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

7

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Parker v. Matthews*, --- U.S. ----, ----, 132 S. Ct. 2148, 2151, 183 L.Ed.2d 32 (2012).

"Clearly established Federal law" should be determined as of the date of the relevant state court decision and is applied to the record that was before the state court that adjudicated the claim on the merits. *Greene v. Fisher*, ---U.S. ----, 132 S. Ct. 38, 181 L.Ed.2d 336 (2011); *Cullen v. Pinholster*, --- U.S. ----, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Jamison v. Klem*, 544 F.3d 266, 274 (3d Cir. 2008). The state court judgment must

8

contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court. *Williams*, 529 U.S. at 405. Thus, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 132 S. Ct. at 2155. Discussions of Supreme Court precedent in district and appellate federal court decisions, however, may amplify such precedent. *Hardcastle v. Horn*, 368 F.3d 246, 256 n. 3 (3d Cir. 2004) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999)). The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Jamison*, 544 F.3d at 274-75.

Few state court decisions will be "contrary to" Supreme Court precedent. More commonly, a federal habeas court must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. A state-court decision involves an "unreasonable application" of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or

9

(2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407. A showing of clear error is not sufficient. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly. *See Harrington v. Richter*, --- U.S. ----, ----, 131 S. Ct. 770, 785, 178 L.Ed.2d 624 (2011) (Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." (quoting *Williams* at 410)); *see also Metrish v. Lancaster*, --- U.S. ----, 133 S. Ct. 1781, 1786-87, 185 L.Ed.2d 988 (2013); *Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005); *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S. Ct. at 786-87. *See also Metrish*, 133 S. Ct. at 1787.

The Supreme Court has reiterated that the federal courts must accord deference to state court decisions. *See Felkner v. Jackson*, ---U.S. ----, 131 S. Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) ("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."); *Cullen v. Pinholster*, 131 S. Ct. at 1398; *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013). *See also Harrington*, 131 S. Ct. at 786 ("We must use habeas corpus as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("whether the trial judge was right or wrong is not the pertinent question under AEDPA"); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold."); *Lockyer*, 538 U.S. at 75 ("it is not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was erroneous.").

Further, AEDPA's standard applies even where "the state court analyzed and rejected a habeas petitioner's federal claims on the merits but gave 'no indication of how it reached its decision.'" *Grant v. Lockett*, 709 F.3d 224, 230 (3d Cir. 2013) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)).

A state court decision is based on "an unreasonable determination of the facts" only if the state court's factual findings are "'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing, *inter alia*, 28 U.S.C. § 2254(d)(2)). Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of "rebutting the presumption by 'clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1)); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001)(factual determinations of state trial and appellate courts are presumed to be correct). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and

logic, must have undergirded it." *Campbell v. Vaughn*, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id.* (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982)).

Even if the petitioner is entitled to habeas relief under AEDPA, the court may grant the writ only if the error was not harmless. Under the harmless error standard, the court must "assess the prejudicial impact of [the] constitutional error in [the] state-court criminal trial." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). The court should hold the error harmless unless it led to "actual prejudice," in the form of a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quotation omitted); *Eley v. Erickson*, 712 F.3d at 847.

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. *See Rainey v. Varner*, 603 F.3d 189, 198 (3d Cir. 2010) (citing *United States ex rel. Montgomery v.*

13

*Brierley*, 414 F.2d 552, 555 (3d Cir. 1969)); *Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir.1998).

## IV.   DISCUSSION

### A.   Prejudicial Trial Testimony

Mr. Baker first asserts that the trial court deprived him of a fair trial by permitting prejudicial testimony.  Before trial, Judge Barisonek conducted a hearing in limine regarding the testimony of State's witness Brian McCloud concerning an incident that had occurred before the robbery of which Mr. Baker had been charged.  The defense attorney, James S. Friedman, Esq., objected to Mr. McCloud's testimony on the ground that the discovery concerning Mr. McCloud was provided only on the eve of trial.  More importantly, Mr. Friedman argued that N.J.R.E. 404(b) precluded admission of Mr. McCloud's testimony because it was highly prejudicial and was being offered as other bad act evidence to prove the criminal charge at issue.

At the conclusion of the motion hearing, Judge Barisonek found that the proffered testimony was relevant to key issues of identification, access to a gun, and operability of the gun. Judge Barisonek further stated that the prejudicial impact could be lessened by redacting certain portions of Mr. McCloud's testimony, such as where Mr. McCloud first met Mr. Baker (in

jail) and the attempted robbery of McCloud.  (Ra15, Oct. 22,

2002 Motion Hearing Transcript at 53:2-55:8.)[2]

The state court summarized Mr. McCloud's trial testimony as

follows:

> [E]arlier on the same night as the Cross robbery, [McCloud]
> went to visit a friend named "Dre" but found that he was
> not at home.  As he was sitting in his car, the police
> approached and asked him for his identification.  McCloud
> complied and, while he was doing so, he noticed three
> people walking by.  He recognized the three as Lark, a
> woman and a man he had been introduced to as "Born."  Born
> was wearing a black hooded sweatshirt with red trim.  The
> police officer also saw the three people and recognized
> that defendant was one of them.  He too described defendant
> as wearing a black hooded sweatshirt with red trim.
>
> Approximately fifteen or twenty minutes later, McCloud
> arrived at a house on South Avenue, where his friend Fuquan
> lived on the second floor.  He walked up the back staircase
> which was dimly lit.  He could see that someone was in the
> hallway and when he asked who it was, the person answered
> "Born."  McCloud then saw that defendant was wearing the
> same clothes he had seen him wearing earlier, except that
> the hood was pulled up over his head.  McCloud asked if
> Fuquan was home and Born said that no one was answering the
> door.  McCloud remarked that this was strange and went down
> the stairs to return to his car.
>
> When he reached the street, McCloud looked back at the
> second floor and saw someone peeking out.  At that moment,
> he was struck from behind near his left ear and heard a

---

[2] Judge Barisonek also rejected Mr. Friedman's argument that the
testimony should be barred because the State had violated
discovery rules in belatedly informing the defense about Mr.
McCloud's proffered testimony until the eve of trial.
Specifically, Judge Barisonek found no willful violation or
withholding of evidence on the part of the State, and further
noted that Mr. Friedman had possessed a copy of the police
report that referred to the McCloud incident since July 10,
2001, when it had been provided to the defense as part of
discovery.  (*Id.*, 55:23-56:6.)

loud bang.  He turned and saw Born, who he identified in
court as defendant, pointing a small black automatic
handgun at his chest.  Born then left and McCloud tried to
follow him.  After McCloud lost sight of defendant, he
flagged down a passing police car.  He returned to the
South Avenue location where the police found a spent nine
millimeter shell casing in the driveway.

(Ra3, July 8, 2005 App. Div. Op. at 5-6.)

At the time McCloud's testimony was offered and again
during the jury charge, Judge Barisonek gave the jury a limiting
instruction regarding the appropriate use of that testimony.
(*Id.* at 8.)  The first limiting instruction emphasized that Mr.
McCloud's testimony could be considered only for purposes of
identification, gun possession and operability of the gun in
connection with the robbery charge for which Mr. Baker was then
being tried.  Judge Barisonek stressed that the testimony could
not be considered for any other purpose.  (Ra17, Oct. 28, 2002
Trial Transcript at 53:2-15.)

The second jury charge, given before jury deliberations,
again strongly cautioned the jury about the proper use of the
testimony:

You've heard some testimony in this case concerning Mr.
Baker's alleged involvement with Mr. McCloud in a prior
incident where a gun was used to strike Mr. McCloud in the
head.  The State has introduced that evidence as part of
this case.  Normally this type of evidence is not permitted
under our rules of evidence.  Our rules of evidence
specifically exclude that type of evidence that the
defendant may have committed another wrong or another crime
or some act when it's offered for the purposes of showing

16

he has a disposition or a tendency to commit a crime charged.  In other words, you can't say because he committed something else, therefore, he committed this offense.  You can't do that and our law does not allow anybody to argue that.

Before you can weigh and give any weight to this evidence, you have to be satisfied, number one, that the defendant was involved in terms of the incident as described involving Mr. McCloud.  If you are not satisfied that he was involved and that it didn't happen in that way, then you don't consider it for any purpose.

If you do find that the incident is believable as described to you and testified to, it can be considered for a specific narrow purpose or in this case purposes and those are the three things I told you already.  It can be used in considering the possession issue about whether or not he actually possessed a gun at the time of the Cross robbery; it can be used for the purpose of showing whether the gun is in fact operable at the time of the Cross robbery and, number three, it can be used for purposes of the identification in terms of who was with whom when either before, during or after the Cross incident.  Those are the only three reasons why you may consider this evidence ...

(Ra19, Oct. 29, 2002 Trial Transcript at 133:14-134:24.)

Judge Barisonek further oriented the jury as to the

contentions of the State and the defense regarding Mr. McCloud's

testimony.  In particular, Judge Barisonek discussed the defense

position regarding that testimony:

The defense is saying to you, first of all, that is not credible that the incident even occurred, that McCloud is not believable to begin with because of his prior convictions and also because of a bias in favor of testifying for the State because of the violation of probation issue and is hoping to gain favor.  The defense is also saying to you that in fact while even if that did happen with Mr. McCloud, it has nothing to do with this defendant and has nothing to do with him being involved

17

with the weapon and him being at the Tammy Cross location and that he was not involved in any way, shape or form and that this is not probative at all as to any of those purposes and that it is not believable and that you should disregard it.  You have to decide who and what you believe.

(*Id.*, 135:14-136:3.)

On direct appeal, Mr. Baker argued that the prejudicial testimony of Mr. McCloud deprived him of a fair trial.  The Appellate Division found no merit to the claim.  The court supported its decision as follows:

> Here, defendant does not dispute the relevance of McCloud's testimony to the issue of identity or possession of an operable handgun shortly before the event for which he was on trial.  Rather, he argues that it was overly prejudicial because it portrayed him as a person with a propensity to use a gun.  Our Supreme Court has rejected similar arguments, *see generally State v. Fortin*, 162 N.J. 517 (2000); *State v. Covell*, 157 N.J. 554 (1999), and our review of the record compels us to reject this argument.  Moreover, to the extent that defendant now objects to the testimony only because of a concern that the jury would consider it for the wrong purpose, we conclude that the judge's strong admonitions to the jury about the proper limited purpose of the testimony sufficed to protect him.  *See State v. Manley*, 54 N.J. 259, 270 (1969).

(Ra3, Jul. 8, 2005 App. Div. Op. at 9-10.)

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 680 (1990)).  Thus, Mr. Baker cannot

18

obtain relief for any purported errors in the state law
evidentiary rulings at his criminal trial, unless they rise to
the level of a deprivation of due process. *Estelle*, 502 U.S. at
70 ("[T]he Due Process Clause guarantees fundamental elements of
fairness in a criminal trial.") (quoting *Spencer v. Texas*, 385
U.S. 554, 563-64 (1967)). For a habeas petitioner to prevail on
a claim that an evidentiary error amounted to a deprivation of
due process, he must show that the error was so pervasive as to
have denied him a fundamentally fair trial. *Keller v. Larkins*,
251 F.3d 408, 413 (3d Cir. 2001) (holding that admission of
evidence may violate due process where the evidence is so
inflammatory as to "undermine the fundamental fairness of the
entire trial"). *See also Cox v. Warren*, Civil Action No. 11-
7132 (FSH), 2013 WL 6022520, *8 (D.N.J. Nov. 13, 2013).

Here, the state courts have determined that the admission
of Mr. McCloud's testimony at trial was appropriate under the
New Jersey Rules of Evidence, with redaction of unduly
prejudicial information and an appropriate limiting instruction
to the jury. Judge Barisonek conducted a thorough pretrial
N.J.R.E. 104 hearing regarding Mr. McCloud's testimony, and
carefully considered its admission under N.J.R.E. 404(b). Judge
Barisonek found that the testimony was clear and convincing
evidence, relevant to important issues concerning

identification, access to a gun and operability of the gun.   To
lessen undue prejudicial impact, Judge Barisonek directed that
portions of Mr. McCloud's testimony be redacted to omit the
location of McCloud's first meeting with Mr. Baker (jail) and
the attempted robbery of Mr. McCloud.    Furthermore, as shown
above, Judge Barisonek gave strong limiting instructions to the
jury at the time of Mr. McCloud's testimony and as part of the
jury charge before deliberation, emphasizing that the testimony
could only be considered for the three discrete and proper
purposes.

In light of the record, this Court, too, finds that the
admission of this testimony did not deprive Mr. Baker of a
fundamentally fair trial.  The decisions by the trial and
appellate state courts are neither contrary to nor an
unreasonable application of Supreme Court precedent.   Therefore,
Mr. Baker is not entitled to habeas relief on this evidentiary
claim.

B.   <u>Ineffective Assistance of Counsel Claims</u>

Mr. Baker next asserts that his trial counsel, Mr.
Friedman, was so ineffective as to deprive him of his Sixth
Amendment rights, and that the state PCR court erred in denying
his PCR petition because both deficient performance and
resulting prejudice were satisfactorily proven as required under

20

the *Strickland/Fritz* test.[3]  In particular, Mr. Baker argues that Mr. Friedman was ineffective because he conducted an inadequate pretrial investigation, failing to interview Brent Lark, Rajon Lewis and Shoranda "Shorty" Williams to develop defense strategy and present testimony supporting a "theft-no-robbery" defense. (ECF No. 1, Pet. at ¶¶ 12B, 12C, 12D, 12E and 12F.)

To prevail on a claim of ineffective assistance of counsel, Mr. Baker must demonstrate that (1) counsel's performance was so deficient as to deprive him of the representation guaranteed to him under the Sixth Amendment of the U.S. Constitution, and (2) the deficient performance prejudiced the defense by depriving the defendant of a fair trial. *Strickland*, 466 U.S. at 687.  To show prejudice under *Strickland*, Mr. Baker must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rainey v. Varner*, 603 F.3d 189, 197-98 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Ross v. Varano*, 712 F.3d 784, 797-98 (3d Cir. 2013).

---

[3] *See Strickland v. Washington*, 466 U.S. 668 (1984), and *State v. Fritz*, 105 N.J. 42 (1987).

21

"Since *Strickland*, the Supreme Court and the Third Circuit have emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013); *Siehl v. Grace*, 561 F.3d 189, 195 (3d Cir. 2009) (citing cases). When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 131 S.Ct. at 785). For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (internal quotation marks omitted) (emphases in original). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

Mr. Baker principally argues that his attorney, Mr. Friedman, was ineffective because he failed to present testimony from Shoranda "Shorty" Williams to support a "theft-no-robbery" defense.  Relatedly, he contends that counsel was deficient for failing to request "ancillary investigative services from the Public Defender" to find and interview Ms. Williams before trial.  Mr. Friedman allegedly admitted at the state PCR hearing that he made a decision not to pursue Ms. Williams for a "theft-no-robbery" defense because there are limited resources available for pool attorneys.  (ECF No. 1, Pet. at ¶ 12C.)

Mr. Baker contends that the outcome of trial would have been different had trial counsel interviewed Ms. Williams and other witnesses in order to present the "theft-no-robbery" defense.  Ms. Williams's testimony, he says, would have "raised substantial issues of credibility" as to the State's witnesses concerning the "actual occurrence of" a robbery and Mr. Baker's culpability.  (ECF No. 1, Pet. at ¶ 12E.)  Specifically, Mr. Baker asserts that Ms. Williams and others would have testified that he did not take anything by force or at gunpoint, but simply removed drugs from the table and left the apartment.  (*Id.*)

One potential witness, Vernon Lewis, indicated that Mr. Baker was not at the location of the robbery. Based on Lewis's

23

testimony, trial counsel constructed what Baker criticizes as a "dead end" defense based on alibi and identification. This defense, according to Baker, was easily refuted at trial since many of the witnesses had been known to each other for years. Mr. Baker alleges that Ms. Williams and other potential witnesses were readily available, because they were housed at the county jail before trial. And such witnesses, he argues, would have cast doubt on the State's witnesses sufficiently "to undermine confidence in the outcome" of trial. (*Id.*)

Mr. Baker raised these arguments in his state PCR proceedings. An evidentiary hearing was held for several days, at which several witnesses testified: Mr. Baker himself; Mr. Friedman; an investigator employed by the PCR counsel, Thomas Monarque; the initial public defender, Shelly Logan; and Ms. Williams. Mr. Baker testified that he was at Ms. Cross's home but did not commit the robbery. Instead, he said, he gave Ms. Williams $15.00 to give to Ms. Cross and took drugs from the table. After leaving the apartment, Mr. Baker shared those drugs with his companions, Mr. Lark, another man called "Pop," and Ms. Williams. (Ra26, May 12, 2008 PCR Transcript at 15:17-20:22.) Mr. Baker further testified that he gave this information and the names of several people at the apartment to

24

both Ms. Logan and Mr. Friedman for investigation. (Id. at 21:2-7; 22:5-8.)

Ms. Logan testified that her file notes indicated that the incident may not have been a robbery, confirming that Mr. Baker had given her this information. She did not recall pursuing any investigation because the case was being pooled as a result of a conflict. She said that she would have left such trial strategy decisions to the pool attorney. (Ra27, June 2, 2008 PCR Transcript at 31:7-32:9.)

Mr. Friedman testified that Mr. Baker had insisted that no robbery had occurred. He did not recall that Mr. Baker had ever told him that he had stolen drugs from Tammy Cross. (Id., 38:13-22.) Mr. Friedman also testified that Mr. Baker gave him the name of his companion at that time, Mr. Lark, who could provide the names of potential alibi witnesses. An investigator was sent to interview Mr. Lark, but Lark declined to cooperate because he had his own criminal matters pending at the time. (Id., 39:2-20.) Mr. Friedman further testified that his notes showed a potential witness named "Shorty", a street name, but that no real name or other identifiers were provided to enable him to investigate further. His notes also showed that "Shorty" had left the house before the robbery, and so would not have had useful eyewitness testimony to offer. According to the notes,

25

both Lark and "Shorty" had been at the apartment, purchased some drugs, and left before the robbery. (*Id.*, 40:1-41:24.)  Mr. Friedman confirmed that the thrust of the defense was to work with the inconsistencies in Tammy Cross's statement and to present an alibi that Mr. Baker had been with Mr. Lark or others at the time of the robbery. (Id., 42:3-13.)

Finally, Ms. Williams testified that she was at Cross's apartment when Mr. Baker was there and saw him take drugs from the table and leave the apartment.  She further testified that Ms. Cross saw Mr. Baker take the drugs.  Ms. Williams also testified that she did not leave the apartment with Mr. Baker. (*Id.*, 101:18-103:16.)

In rendering his decision on the PCR application, Judge Barisonek found that Ms. Williams's story contradicted Mr. Baker's testimony and was not credible.  For instance, Ms. Williams testified that she did not leave the apartment with Mr. Baker; that she did not know Mr. Lark or "Pop"; and that no other man was with Mr. Baker in the apartment.  In contrast, Mr. Baker testified that he was with Mr. Lark and "Pop" and that they all left together with Ms. Williams.  He also testified that he gave Ms. Williams some of the drugs, which she disputed. (Ra29, June 4, 2008 PCR Decision Transcript at 19:5-20:8.)

Judge Barisonek also found, based on Mr. Friedman's testimony at the PCR hearing, that Mr. Friedman did send a request to investigate, but the people who could purportedly verify Petitioner's defense could not be located.  (Id. at 21:21-22:2.)  Significantly, Judge Barisonek found that the request for investigation of witnesses was intended to support an alibi and inconsistent-identification defense.  Judge Barisonek emphasized:

> It is incredulous I find that Mr. Friedman would do this if the defendant told him he was there and that defendant stole the drugs.  What a waste of time.
>
> Why would Mr. Friedman manufacture a defense if the defendant told him this.  Clearly it would be a whole different approach to the case because you don't need alibi.  You don't need ID witnesses.  The reason Friedman asked for this investigation to be conducted for this purpose I find is because that's what the defendant told him.
>
> I find the defendant rather told Mr. Friedman that someone else committed the robbery and that while he was at the apartment with [Lark], he was mis-identified as the robber who supposedly later committed the robbery after the defendant had left and that's why alibi becomes relevant, why ID becomes relevant, and the inconsistencies become relevant, and the testimony of the witnesses whom the prosecutor was going to call.  Not that there was a theft as opposed to a robbery.

(Id. at 22:7-23:2.)

Judge Barisonek also found that Mr. Friedman did have an investigator try to locate "Shorty" but that the attempt failed because he did not have any identifiers other than a street

27

name.  Moreover, Judge Barisonek remarked that Ms. Williams'
testimony, even if she had been located, would not have been
helpful because she had left before the robbery took place, and
her testimony contradicted Mr. Baker's version.  (*Id.* at 23:9-
15.)  As to the claim that Mr. Friedman was deficient in failing
to locate and interview Mr. McCloud before trial, Judge
Barisonek found that Mr. Friedman would not have called Mr.
McCloud as a witness because he was detrimental to Mr. Baker's
case.  Consequently, Judge Barisonek ruled that Mr. Baker could
not satisfy the prejudice prong under *Strickland*.  (*Id.* at
26:11-17.)

Finally, Judge Barisonek commented that this case was "not
about the lack of resources" or a "failure to investigate"
because Mr. Friedman was a "bulldog" and accomplished the
investigation needed before trial, as supported by several
requests for investigation produced by Mr. Friedman at the PCR
hearing.  (*Id.* at 25:1-18.)

On appeal from denial of post-conviction relief, the
Appellate Division affirmed, finding that Judge Barisonek had
"conducted a thorough evidentiary hearing" that addressed and
rejected each and every claim presented by Mr. Baker.  The
Appellate Division further stated that it was "satisfied that
[Mr. Baker] ha[d] not established either prong of the

*Strickland/Fritz* test," and affirmed the denial of post-conviction relief "substantially for the reasons expressed by Judge Barisonek in his June 4, 2008 oral opinion."  (Ra11, Dec. 8, 2010 App. Div. Op. at 9.)

It is a hallmark of *Strickland* that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052; *Moore v. Secretary Pennsylvania Dept. of Corrections*, 457 F. App'x 170, 182 (3d Cir. 2012). "Only choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006); *see Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" on claim of ineffective assistance of counsel, and "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," quoting *Strickland*, 466 U.S. at 690-91).

Here, as discussed above, the state courts determined, based on thorough review of the state court trial record and PCR testimony, that Mr. Friedman was not deficient in his

representation of Mr. Baker.  Indeed, Judge Barisonek expressly found that Mr. Friedman was a "bulldog" who conducted a reasonable investigation of potential witnesses in support of an alibi and inconsistent identification defense, and that Mr. Baker's proposed defense of "theft-no-robbery" was incredible and implausible in light of the factual record.  Moreover, as to an investigation of Ms. Williams as a potential witness, Judge Barisonek found that Mr. Friedman attempted to investigate, but that Mr. Baker had provided no identifiers other than a street name that would have facilitated the location of Ms. Williams before trial.  Finally, Mr. Baker's argument that the lack of resources controlled an inadequate investigation was belied by the record, which showed that Mr. Friedman did request the necessary investigative services on several occasions as to potential witnesses and defenses.  Consequently, this Court agrees with the state court, and finds that Mr. Baker has not demonstrated the first prong of deficient performance by trial counsel as required under *Strickland*.

Furthermore, even if this Court were to find that counsel was deficient in failing to locate and interview Ms. Williams, Mr. Baker could not establish the requisite prejudice under the second prong of *Strickland*.  Prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceedings would have been different."
*Strickland*, 466 U.S. at 694. A reasonable probability is one
"sufficient to undermine confidence in the outcome." *Id.*
Prejudice is reviewed in light of the totality of the evidence
at trial and the testimony at the collateral review hearing.
*Rolan*, 445 F.3d at 682.

The problem for Mr. Baker in this case is that the
testimony of Ms. Williams contradicted Petitioner's testimony in
key respects, and "was not credible due to multiple
inconsistencies." (Ra11, Dec. 8, 2010 App. Div. Op. at 5.)
Thus, the state courts reasonably determined that the testimony
of Ms. Williams would have been "inconsequential" and not likely
to change the outcome of trial. (Ra29, June 4, 2008 PCR
Decision at 23:13; 29:16-20.) Furthermore, as the PCR court
observed, the "state ended up having an extremely strong case
once they found McCloud." (*Id.* at 29:21-22.)

Looking through AEDPA's deferential lens, this Court finds
that the state PCR court's determination on prejudice, a
determination that has preclusive effect, was not an
unreasonable application of *Strickland* under § 2254(d)(1). *See*
*Knowles*, 556 U.S. at 123 (the standard is not whether the state
court's determination under *Strickland* "was incorrect but
whether that determination was unreasonable—a substantially

higher threshold") (citations omitted) (internal quotation marks omitted); *Williams*, 529 U.S. at 398 (describing state prejudice determination as unreasonable for failing to evaluate the totality of the evidence).   Moreover, given the strength of the evidence at trial, including the testimony of Ms. Cross and Mr. McCloud, the state courts were not objectively unreasonable in determining that there was no reasonable probability that the result of the trial would have been different if Mr. Friedman had done what Petitioner, in hindsight, says he should have done. Consequently, this Court is bound to uphold the state courts' conclusion that Mr. Baker failed to establish prejudice. *See Collins v. Secretary of Pennsylvania Dept. of Corrections*, 742 F.3d 528, 550 (3d Cir. 2014).

Therefore, Mr. Baker's claims of ineffective assistance of trial counsel, and his related claim that the state PCR court erred in summarily rejecting these claims, namely Claims Two through Six, are denied as substantively meritless.

## V.   CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.   *See* Third Circuit Local Appellate Rule 22.2.   The Court may issue a certificate of appealability only if Mr. Baker "has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   For the

reasons discussed above, this Court's review of the claims advanced by Mr. Baker demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.   Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## VI.   CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition must be denied, and a certificate of appealability will not issue.   An appropriate Order follows.

KEVIN MCNULTY
United State District Judge